Carlson / IBM Proprietary Information

# Carlson Companies, Inc. ("Carlson")

# and

# International Business Machines Corporation ("IBM")

# Master Services Agreement

## AMENDMENT #45 – ATTACHMENT #1

## Carlson/IBM Proprietary Information

Master Services Agreement Page 1 of 153 June 19, 2009
(Final Execution Copy)

EXHIBIT
tabbies
A



**REDACTED**

**13.4 Confidentiality.**

(a) **Proprietary Information.** IBM and Carlson each acknowledge that the other possesses and will continue to possess information that has been developed or received by it, has commercial value in its or its customers' business and is not generally available to the public. Except as otherwise specifically agreed in writing by the Parties, "**Proprietary Information**" means (i) this Agreement and the terms hereof, (ii) all information marked "Level 3," "Level 4," "confidential," "vital trust," "restricted" or "proprietary" by either Party, (provided that the foregoing designations shall have no effect or meaning whatsoever other to signify to a receiving party that the information constitutes "Proprietary Information"), and (iii) any other information that is treated as confidential by the disclosing Party and would reasonably be understood to be confidential under the circumstances, whether or not so marked. In the case of

Carlson and the Eligible Recipient, Proprietary Information also shall include Software provided to IBM by or through Carlson or the Eligible Recipients, Carlson Data, materials and information identified as attorney-client privileged materials or attorney work product, customer lists, customer contracts, customer information, rates and pricing, information with respect to competitors, strategic plans, account information, rate case strategies, research information, chemical formulae, product formulations, plant and equipment design information, catalyst information, information identified as trade secrets, financial/accounting information (including assets, expenditures, mergers, acquisitions, divestitures, billings collections, revenues and finances), human resources and personnel information, marketing/sales information, business plans or operations, third party contracts, licenses, internal or external audits, law suits, regulatory compliance or other similar information or data obtained, received, transmitted, processed, stored, archived, or maintained by IBM under this Agreement. By way of example, Carlson Proprietary Information shall include plans for changes in Carlson's or an Eligible Recipient's facilities, business units and product lines, plans for business mergers, acquisitions or divestitures, rate information, plans for the development and marketing of new products, financial forecasts and budgets, technical proprietary information, employee lists and company telephone or e-mail directories. In the case of IBM, Proprietary Information shall include financial information, account information, information regarding IBM's business plans and operations, and proprietary software, tools and methodologies owned by IBM and used in the performance of the Services.

(b) **Obligations.**

(i) During the term of this Agreement and at all times thereafter as specified in **Section 13.4(f),** IBM and Carlson shall not disclose, and shall maintain the confidentiality of, all Proprietary Information of the other Party (and in the case of IBM, the Eligible Recipients). Carlson and IBM shall each use at least the same degree of care to safeguard and to prevent disclosing to third parties the Proprietary Information of the other as it employs to avoid unauthorized disclosure, publication, dissemination, destruction, loss, or alteration of its own information (or information of its customers) of a similar nature, but not less than reasonable care. IBM Personnel shall not have access to Carlson Proprietary Information without proper authorization. Upon receiving such authorization, authorized IBM Personnel shall have access to Carlson Proprietary Information only to the extent necessary for such person to perform his or her obligations under or with respect to this Agreement or as otherwise naturally occurs in such person's scope of responsibility, provided that such access is not in violation of Law.

(ii) The Parties may disclose Proprietary Information to their Affiliates, auditors, attorneys, accountants, consultants, contractors and subcontractors, where (1) use by such person or entity is authorized

under this Agreement, (2) such disclosure is necessary for the performance of such person's or entity's obligations under or with respect to this Agreement or otherwise naturally occurs in such person's or entity's scope of responsibility, (3) the person or entity (and its applicable officers and employees) agree in writing to assume obligations that are the same or substantially similar to those described in this **Section 13.4**, and (4) the disclosing Party assumes full responsibility for the acts or omissions of such person or entity regarding their use of Proprietary Information and takes reasonable measures to ensure that the Proprietary Information is not disclosed or used in contravention of this Agreement. Any disclosure to such person or entity shall be under the terms and conditions as provided herein. Each Party's Proprietary Information shall remain the property of such Party.

(iii) Neither Party shall (1) make any use or copies of the Proprietary Information of the other Party except as contemplated by this Agreement, (2) acquire any right in or assert any lien against the Proprietary Information of the other Party, (3) sell, assign, transfer, lease, or otherwise dispose of Proprietary Information to third parties or commercially exploit such information, including through Derivative Works, or (4) refuse for any reason (including a default or material breach of this Agreement by the other Party) to promptly provide the other Party's Proprietary Information (including copies thereof) to the other Party if requested to do so. Notwithstanding the foregoing, Carlson may disclose Proprietary Information relating to the terms of this Agreement and/or IBM's performance hereunder (e.g., applicable Service Levels and measurements of IBM's performance with respect to such Service Levels) in connection with a benchmarking under **Section 11.10** or the solicitation of proposals for or the procurement of the same or similar services from Carlson Third Party Contractors. Upon expiration or any termination of this Agreement and completion of each Party's obligations under this Agreement, each Party shall return or destroy, as the other Party may direct, all documentation in any medium that contains, refers to, or relates to the other Party's Proprietary Information within thirty (30) days (except Contract Records, which shall be retained by IBM for the Audit Period specified in **Section 9.9(a)** unless and to the extent IBM is directed by Carlson to deliver such Contract Records to Carlson prior to the expiration of such audit period, and except that either Party may retain copies of the other Party's Proprietary Information to the extent required by applicable Laws or as necessary to enforce its rights under this Agreement). Each Party shall deliver to the other Party written certification of its compliance with the preceding sentence signed by an authorized representative of such Party. In addition, each Party shall cause its employees to comply with these confidentiality provisions.

(c) **Exclusions.** **<u>Section 13.4(b)</u>** shall not apply to any particular information which the receiving Party can demonstrate (i) is, at the time of disclosure to it, generally available to the public other than through a breach of the receiving Party's or a third party's confidentiality obligations; (ii) after disclosure to it, is published by the disclosing Party or otherwise becomes generally available to the public other than through a breach of the receiving Party's or a third party's confidentiality obligations; (iii) is lawfully in the possession of the receiving Party at the time of disclosure to it; (iv) is received from a third party having a lawful right to disclose such information; or (v) is independently developed by the receiving Party without reference to Proprietary Information of the furnishing Party, provided however, that the exclusions in the foregoing subsections (i) and (ii) shall not be applicable to the extent that the disclosure or sharing of such information by the applicable Party would violate any limitation, restriction, consent or notification requirement under any applicable federal or state information privacy law or regulation then in effect. The Parties acknowledge and agree that Proprietary Information that is not generally available to the public shall not be deemed public or subject to this exclusion merely because it is combined with information that is generally available to the public. In addition, the receiving Party shall not be considered to have breached its obligations under this **<u>Section 13.4</u>** for disclosing Proprietary Information of the other Party as required, in the opinion of legal counsel, to satisfy any legal requirement of a competent government body, provided that, promptly upon receiving any such request, such Party, to the extent it may legally do so, advises the other Party of the Proprietary Information to be disclosed and the identity of the third party requiring such disclosure prior to making such disclosure in order that the other Party may interpose an objection to such disclosure, take action to assure confidential handling of the Proprietary Information, or take such other action as it deems appropriate to protect the Proprietary Information. The receiving Party shall use commercially reasonable efforts to cooperate with the disclosing Party in its efforts to seek a protective order or other appropriate remedy or in the event such protective order or other remedy is not obtained, to obtain assurance that confidential treatment will be accorded such Proprietary Information.

(d) **Loss of Proprietary Information.** Each Party shall (i) immediately notify the other Party of any possession, use, knowledge, disclosure, or loss of such other Party's Proprietary Information in contravention of this Agreement, (ii) promptly furnish to the other Party all known details and assist such other Party in investigating and/or preventing the reoccurrence of such possession, use, knowledge, disclosure, or loss, (iii) cooperate with the other Party in any investigation or litigation deemed necessary by such other Party to protect its rights, and (iv) promptly use commercially reasonable efforts to prevent further possession, use, knowledge, disclosure, or loss of Proprietary Information in contravention of this Agreement. Each Party shall bear any costs it incurs in complying with this **<u>Section 13.4(d)</u>**.

(e) **No Implied Rights**. Nothing contained in this **Section 13.4** shall be construed as obligating a Party to disclose its Proprietary Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to any Proprietary Information of the other Party.

(f) **Survival**. IBM's obligations with respect to Carlson Personal Data and Carlson's human resources and personnel information shall survive the expiration or termination of this Agreement and shall be perpetual. The Parties' obligations of non-disclosure and confidentiality with respect to all other Proprietary Information shall survive the expiration or termination of this Agreement for a period of ten (10) years from the later of (i) the expiration or termination of this Agreement (including all periods of Termination Assistance Services), or (ii) the return or destruction of Proprietary Information in accordance with **Sections 13.1** and **13.4(b)(iii)** (but not including accounting information pertaining to this Agreement that IBM is required to maintain pursuant to applicable Laws); provided, however, that the passage of this ten (10) year period shall not absolve either Party of responsibility for any breach of this **Article 13** occurring prior to the expiration of such ten (10) year period.

**REDACTED**